**No. 26-40063**

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff–Appellee*;

v.

NORA ALICIA AVILA-GUEL;
LEONARDO BAEZ-LARA,
*Defendants–Appellants*.

On Appeal from the United States District Court
For the Southern District of Texas, Brownsville Division
No. 1:25-CR-138

BRIEF OF PLAINTIFF–APPELLEE

AARON F. REITZ
United States Attorney

CARMEN CASTILLO MITCHELL
Chief, Appellate Division

JASON SMITH
Assistant United States Attorney
1000 Louisiana, Suite 2300
Houston, Texas 77002
(713) 567-9102

ATTORNEYS FOR APPELLEE

## STATEMENT REGARDING ORAL ARGUMENT

The facts and legal arguments are adequately presented in the briefs and record; oral argument would not significantly aid the decisional process, and the United States does not request oral argument. Fed. R. App. P. 34(a)(2)(C).

# TABLE OF CONTENTS

**Page**

STATEMENT REGARDING ORAL ARGUMENT .................................. i

TABLE OF AUTHORITIES .................................................................. v

STATEMENT OF JURISDICTION ........................................................ 1

STATEMENT OF THE ISSUES .............................................................. 2

1. Have appellants shown that, when viewing the trial evidence and all reasonable inferences that can be drawn from that evidence in the light most favorable to the prosecution, no rational juror could have found that they conspired to harbor illegal aliens, and did harbor the two aliens named in the indictment? ............................... 2

2. Have appellants shown that the district court erred in finding that the material witnesses were unavailable for trial? ......................................................................... 2

3. Have appellants shown that the district court plainly erred by failing to sua sponte hold that their Confrontation Clause rights had been violated because, at the time they cross-examined the material witnesses at their depositions, the United States had not explicitly stated that it intended to prove its case by focusing on the element of harboring rather than concealment or shielding from detection? ...................................................... 2

4. Was any error in admitting the material witnesses' deposition testimony harmless in light of appellants' own admissions and the other substantial evidence presented at trial? ................................................................. 2

## TABLE OF CONTENTS, CONT'D

**Page**

STATEMENT OF THE CASE .......... 2

I. Avila-Guel and Baez-Lara are charged with harboring and conspiring to harbor illegal aliens following an investigation of their bakery. .......... 2

II. After a three-day trial, a jury finds appellants guilty of harboring Ibarra-Otero and Sanchez-Martinez, and of conspiring to harbor illegal aliens. .......... 13

A. The district court finds that the material witnesses are unavailable for trial. .......... 13

B. The jury finds appellants guilty on all counts after the government presents audio visual evidence, photographs, testimony about appellants' admissions, and statements by the material witnesses. .......... 16

SUMMARY OF ARGUMENT .......... 26

ARGUMENT .......... 28

I. Sufficient evidence supported appellants' convictions for harboring and conspiring to harbor. .......... 28

A. Standard of review—de novo, but highly deferential to the verdict. .......... 28

B. A jury could reasonably conclude that appellants harbored the material witnesses and conspired to harbor illegal aliens. .......... 29

## TABLE OF CONTENTS, CONT'D

**Page**

C. Even if harboring required the government to show "concealment, shielding from detection, or comparable covert conduct," the jury could reasonably conclude that appellants' actions met that standard. .......... 32

II. Presentation of the material witnesses' recorded deposition testimony was consistent with the Confrontation Clause. .......... 37

A. Standard of review—de novo and plain error .......... 37

B. The material witnesses were unavailable despite the Government's reasonable efforts to secure their appearance at trial. .......... 39

C. Appellants cannot show reversible plain error regarding their newly raised claim that they were denied an effective opportunity to cross-examine the material witnesses. .......... 43

III. Alternatively, any Confrontation Clause error was harmless. .......... 46

CONCLUSION .......... 48

CERTIFICATE OF SERVICE .......... 49

CERTIFICATE OF COMPLIANCE .......... 50

# TABLE OF AUTHORITIES

**Case(s)** **Page(s)**

*Cruz* v. *Abbott*, 849 F.3d 594 (5th Cir. 2017) ........ 31

*Fahy* v. *Connecticut*, 375 U.S. 85 (1963) ........ 46

*Melendez-Diaz* v. *Massachusetts*, 557 U.S. 305 (2009) ........ 44

*Puckett* v. *United States*, 556 U.S. 129, 135 (5th Cir. 2009) ........ 38

*United States* v. *Acosta*, 475 F.3d 677 (5th Cir. 2007) ........ 37, 38, 39

*United States* v. *Aguilar-Tamayo*, 300 F.3d 562 (5th Cir. 2002) ........ 41

*United States* v. *Allie*, 978 F.2d 1401 (5th Cir.1992) ........ 39, 41

*United States* v. *Bowen*, 818 F.3d 179 (5th Cir. 2016) ........ 13

*United States* v. *Cabello*, 33 F.4th 281 (5th Cir. 2022) ........ 28

*United States* v. *Calderon-Lopez*, 268 F. App'x 279 (5th Cir. 2008) (unpublished) ........ 40, 45

*United States* v. *Cantu*, 557 F.2d 1173 (5th Cir. 1977) ........ 30, 31

*United States* v. *Chavez-Hernandez*, 671 F.3d 494, 497-98 (5th Cir. 2012) ........ 38

*United States* v. *De Jesus-Batres*, 410 F.3d 154 (5th Cir. 2005) ........ 30

*United States* v. *del Carpio Frescas*, 932 F.3d 324, 328 (5th Cir. 2019) ........ 29

## TABLE OF AUTHORITIES, CONT'D

**Case(s)** **Page(s)**

*United States* v. *Dominguez Benitez*, 542 U.S. 74, 82 (5th Cir. 2004) ....... 38

*United States* v. *Foley*, 946 F.3d 681 (5th Cir. 2020) ....... 45

*United States* v. *Fulton*, 928 F.3d 429 (5th Cir. 2019) ....... 29

*United States* v. *Gaspar-Felipe*, 4 F.4th 330 (5th Cir. 2021) ....... 15, 40

*United States* v. *Gonzalez*, 792 F.3d 534 (5th Cir. 2015) ....... 44

*United States* v. *Grant*, 683 F.3d 639 (5th Cir. 2012) ....... 29

*United States* v. *Holley*, 831 F.3d 322 (5th Cir. 2016) ....... 9

*United States* v. *Jimenez*, 158 F.4th 628 (5th Cir. 2025) ....... 28

*United States* v. *Miller*, 634 F.3d 841 (5th Cir. 2011) ....... 45

*United States* v. *Neal*, 578 F.3d 270 (5th Cir. 2009) ....... 37

*United States* v. *Pineda-Rodriguez*, No. 20-51031, 2021 WL 5871880 (5th Cir. 2021) (unpublished) ....... 39

*United States* v. *Rubio-Gonzalez*, 674 F.2d 1067 (5th Cir. 1982) ....... 30, 31

*United States* v. *Vargas-Ocampo*, 747 F.3d 299 (5th Cir. 2014) (en banc) ....... 28, 37

*United States* v. *Vargas-Soto*, 700 F.3d 180 (5th Cir. 2012) ....... 45

*United States* v. *Varyonki*, 645 F.2d 453 (5th Cir. 1981) ....... 31

## TABLE OF AUTHORITIES, CONT'D

**Case(s)** **Page(s)**

*United States* v. *Watkins*, 741 F.2d 692 (5th Cir. 1984) .................. 46, 47

*United States* v. *Yusuf*, 57 F.4th 440, 444 (5th Cir. 2023) .................... 29

*Villas as Parkside Partners* v. *City of Farmer's Branch*,
726 F.3d 524 (5th Cir. 2013) ........................................................ 31

**Statutes and Rules**

8 U.S.C. § 1324 ............................................................... *passim*

8 U.S.C. § 1324(a) ............................................................... 31

8 U.S.C. § 1324(a)(1)(A)(iii) ............................................... 8, 9, 29

8 U.S.C. § 1324(a)(1)(A)(v)(II) ............................................... 23

18 U.S.C. § 3231 ............................................................... 1

28 U.S.C. § 1291 ............................................................... 1

Fed. R. App. P. 4(b)(1)(A) ............................................................ 1

Fed. R. App. P. 34(a)(2)(C) ............................................................ i

5th Cir. R. 28.2.2 ............................................................... 3

## STATEMENT OF JURISDICTION

The district court had jurisdiction in this criminal case under 18 U.S.C. § 3231. Avila-Guel and Baez-Lara appeal from judgments imposed on January 21, 2026, and entered on January 30, 2026. ROA.566, 2649. They timely filed their respective notices of appeal on February 3, 2026. ROA.574, 2657; Fed. R. App. P. 4(b)(1)(A). This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. **Have appellants shown that, when viewing the trial evidence and all reasonable inferences that can be drawn from that evidence in the light most favorable to the prosecution, no rational juror could have found that they conspired to harbor illegal aliens, and did harbor the two aliens named in the indictment?**

2. **Have appellants shown that the district court erred in finding that the material witnesses were unavailable for trial?**

3. **Have appellants shown that the district court plainly erred by failing to sua sponte hold that their Confrontation Clause rights had been violated because, at the time they cross-examined the material witnesses at their depositions, the United States had not explicitly stated that it intended to prove its case by focusing on the element of harboring rather than concealment or shielding from detection?**

4. **Was any error in admitting the material witnesses' deposition testimony harmless in light of appellants' own admissions and the other substantial evidence presented at trial?**

## STATEMENT OF THE CASE

### I. Avila-Guel and Baez-Lara are charged with harboring and conspiring to harbor illegal aliens following an investigation of their bakery. [1]

[1] In addition to the evidence admitted at trial, the Statement of the Case relies on the facts included in appellants' presentence investigation reports, the accuracy of which they did not challenge below.

In December 2024, a caller to the Homeland Security Investigations (HSI) tip line reported that Abby's Bakery in Los Fresnos, Texas, was involved in human trafficking and forced labor, and that illegal aliens were being employed and housed at the business. ROA.3698 (PSR ¶ 11).[2] Investigators subsequently surveilled the bakery and another business attached to it in the same strip mall (Dulce's Café) and saw several individuals leaving a side door near the café and walking toward the front door of the bakery. ROA.3698 (PSR ¶ 12).

Following up on the tip further, HSI investigators conducted a worksite enforcement action at the bakery in February 2025 and found multiple illegal aliens and temporary visa holders (who were not authorized to work in the United States) employed there. ROA.3738, 3740 (PSR ¶¶ 13, 19). ROA.3698 (PSR ¶¶ 13-14). Agents interviewed Baez-Lara and Avila-Guel ("Appellants"), who stated that they owned the

---

[2] "ROA" refers to the record on appeal, which is cited in accordance with 5th Cir. R. 28.2.2. For sealed documents that have a single page in the record on appeal with a link to the document on the district court DCN, documents are cited to their ROA placeholder page, with pincites to relevant pages (p.) within the document, using the district court's page numbers at the top of each page; time markers are also included for specific portions of audio recordings. Government exhibits admitted at trial are also identified by the abbreviation "GX" followed by the exhibit number. Citations to appellants' final presentence investigation reports (ROA.3734-67 (Baez final PSR) ROA.1712-45 (Avila-Guel final PSR)) include citations to specific paragraphs in the format "PSR ¶ xx."

bakery and café. ROA.3738-39 (PSR ¶ 15). Apparently referring to the investigation by immigration officials, appellants stated that they "knew this would happen one day." ROA.3739 (PSR ¶ 15).

When interviewed, appellants reported that they both had authority to hire and fire employees, admitted that they employed illegal aliens and temporary visa holders who were not authorized to work in the United States, and stated that they knew the consequences of doing so. ROA.3739 (PSR ¶ 15). Appellants told investigators that the aliens lived in Suite 5 of the same strip mall (owned by appellants) where the bakery is located and they consented to a search of that unit. *See* ROA.3738-39 (PSR ¶¶ 15-16). Baez-Lara took the investigators to Suite 5, approximately a 30-second walk away from the bakery. ROA.3646 (GX 19 at 8:57-9:34, 21:29-22:06). The entrance to Suite 5 lay in an alcove near a sign for Dulce's Café, as shown in Government Exhibit 11 (below), which was admitted at trial.




**Entrance to Suite 5**

ROA.3473 (GX 11). The glass door to Suite 5 was covered in plain brown paper, as were the suite's windows, blocking the view inside, as shown in the still images below, which were captured from an audiovisual recording of much of the worksite enforcement action. ROA.3646 (GX 19 at 10:26-10:29). On that recording, after Baez-Lara led investigators to Suite 5, one of the investigators can be heard stating, "[a]ll the windows are boarded up, this is strange" and wondering aloud whether someone inside the suite was "watching outside." ROA.3665 (GX 20 (transcript and translation of GX 19)). The agent later reiterated, "[o]kay, this is

weird, right here." ROA.3666.






**Door to Suite 5** **Window to Suite 5**

The interior of Suite 5 "was long, cramped, narrow, and rectangular, with approximately six (6) small mattresses along its eastern wall, two (2) restrooms, and no kitchen." ROA.3740 (PSR ¶ 17). "[F]ood and kitchen items presumably meant for the bakery and/or café" were stored inside. ROA.3740 (PSR ¶ 17). Investigators documented the living conditions inside Suite 5 in the photographs below. ROA.3466-72.


GOVERNMENT
EXHIBIT
5
B-25-138


GOVERNMENT
EXHIBIT
6
B-25-138


GOVERNMENT
EXHIBIT
7
B-25-138


GOVERNMENT
EXHIBIT
8
B-25-138







Two of the illegal aliens found working at Abby's bakery, Roberto Ibarra-Otero and Gerardo Sanchez-Martinez were detained as material witnesses. ROA.32, ROA.3738 (PSR ¶ 13).

In March 2025, appellants were charged in a three-count indictment. ROA.42-44.

- Count One charged appellants with conspiring to violate 8 U.S.C. § 1324(a)(1)(A)(iii). ROA.42-43. That statute, in relevant part, criminalizes conspiring to "conceal[ ], harbor[ ], or shield[ ] from detection" an alien "in any place, including any building[,]" "knowing or in reckless disregard of the fact that an alien has come

to, entered, or remains in the United States in violation of law." 8 U.S.C. § 1324.

- Count Two charged appellants with substantively violating 8 U.S.C. § 1324(a)(1)(A)(iii) by "conceal[ing], harbor[ing], and shield[ing] from detection, and attempt[ing] to conceal, harbor, [and] shield from detection," Ibarra-Otero "in buildings and other places and by means of transportation." ROA.42-43.[3]
- Count Three charged appellants with substantively violating 8 U.S.C. § 1324(a)(1)(A)(iii) by "conceal[ing], harbor[ing], and shield[ing] from detection, and attempt[ing] to conceal, harbor, [and] shield from detection," Sanchez-Martinez "in buildings and other places and by means of transportation." ROA.43.

The material witnesses[4] were deposed pursuant to Fed. R. Crim. P. 15(a)(2). ROA.3477-3645. During the depositions, counsel for Baez-Lara and Avila-Guel extensively cross-examined them both. ROA.3500-52,

---

[3] The indictment was phrased in the conjunctive, pursuant to this Court's well-established precedent that "a disjunctive statute may be pleaded conjunctively and proved disjunctively." *United States* v. *Holley*, 831 F.3d 322, 328 n.14 (5th Cir. 2016) (internal quotation omitted).

[4] Unless otherwise indicated, when used in this brief, the term "material witnesses" collectively refers to Ibarra-Otero and Snachez-Martinez.

3585-3640. At the conclusion of their testimony, the material witnesses were served with subpoenas to appear as witnesses at appellants' trial. ROA.108-11, 3553-54, 3640-42. The subpoenas were accompanied by letters that included contact information for the victim witness coordinator for the U.S. Attorney's Office, the case agent, and the assigned AUSA. *See* ROA.3553-54, 3640-42. The letters also advised the witnesses that they would be reimbursed for travel to testify at trial. *See* ROA.3554.

During the depositions, the United States obtained contact information from the material witnesses, each of whom provided their wives' telephone number as the way to contact them because their own cellphones had been seized. *See* ROA.3484, 3552, 3564-65. Additionally, on cross-examination, Sanchez-Martinez testified that he understood that he needed to return to testify at trial and Ibarra-Otero confirmed that he was willing to do so. ROA.3639, 3552. Following their depositions, a United States Magistrate Judge released the material witnesses to be turned over to immigration authorities, and they were subsequently removed to Mexico. ROA.106-11, 116; *see also* ROA.288.

After the United States indicated that it sought "to prove a violation

of the statute in this case by focusing on the element of harboring to the exclusion of the elements of concealment or shielding from detection[,]" (ROA.190) the parties engaged in extensive pretrial briefing and argument regarding the meaning of the term "harboring" in 8 U.S.C. § 1324. *See, e.g.*, ROA.190-94, 353-61, 775-92, 833-36. In that briefing and argument, the United States argued that the "conceal[ing], harbor[ing], and shield[ing] from detection" constituted separate ways a defendant could violate 8 U.S.C. § 1324 and that a conviction could be sustained by proof that a defendant harbored an alien, without proof that they also concealed or shielded the alien from detection. *See, e.g.,* ROA.190-94. Consistent with that position, the United States asked the district court to use Fifth Circuit Pattern Jury Instruction 2.01C to instruct the jury regarding the elements of harboring. *See* ROA.235, 239-40. Appellants asked the district court to additionally instruct the jury, "*[y]ou are further instructed that you must examine whether the defendant engaged in acts to conceal the alien from detection,* the mere act of providing shelter to an alien is not, alone, sufficient to prove beyond a reasonable doubt the defendant harbored an alien." ROA.358 (emphasis added).

The district court denied appellants' request to include the

italicized language above when instructing the jury, explaining that "concealed, harbored, [and] shielded from detection are three separate iterations" under the statute and that the government was "proceeding under that [sic] the defendant harbored the alien within the United States." ROA.776. Finding that Fifth Circuit Pattern Jury Instruction 2.01C was "an accurate and complete rendition of the law," the district court announced that it would use that instruction rather than appellants' proposed language, but that it would also instruct the jury "that the mere act of providing shelter to an alien is not alone sufficient to prove beyond a reasonable doubt that the defendant harbored an alien." ROA.777. Discussing the "mere act" language, the district court explained that, while "the mere act of providing shelter by itself is insufficient . . . if you begin to add elements to it, it doesn't matter if it's . . . concealment or shielding, it could be employment, it could be other things, then that . . . could be sufficient for the jury to reach a guilty verdict." ROA.785. Accordingly, the court held that appellants could not "argue to the jury that unless the government proves concealment or shielding from detection that it cannot obtain a guilty verdict."[5] ROA.791.

[5] On appeal, Baez-Lara and Avila-Guel challenge only the sufficiency of the evidence

## II. After a three-day trial, a jury finds appellants guilty of harboring Ibarra-Otero and Sanchez-Martinez, and of conspiring to harbor illegal aliens.

### A. The district court finds that the material witnesses are unavailable for trial.

Prior to appellants' trial, the United States filed a motion asking this district court to find that the material witnesses were unavailable to testify at trial and to admit the recordings of their respective depositions. ROA.288-300. The Government explained that, beginning less than a month after the witnesses were released from custody and removed, the case agent had begun regular attempts to contact them via telephone and text message "to check in and keep them informed of the status of the trial." ROA.288. The motion included call logs signed by the case agent documenting those attempts. ROA.299-300. The motion, however, reflected that the agent's attempts had been "without success until the past week where one Material Witness informed the Case Agent that he would try to make it to testify while the other informed the Case Agent

---

and do not appeal the district court's jury instructions or its order precluding them from arguing that the government was required to prove concealment or shielding from detection in order for the jury to convict. They have, accordingly, forfeited any challenge to those issues. *United States* v. *Bowen*, 818 F.3d 179, 192 n.8 (5th Cir. 2016) (any issue not raised in an appellant's opening brief is forfeited).

that he would not be returning to testify." ROA.288-89.

The motion further reflected that "[p]rior to making contact with the Material Witnesses[,]" the case agent "contact[ed] the State Department contact in Matamoros requesting assistance in locating the witnesses by requesting a search of the Tamaulipas State Civil Registry as well as informal searches." ROA.289. The agent also "contacted the international bridge to inform them that should the Material Witnesses show up on the eve of trial to serve as witnesses, they should be paroled into the United States on the basis of their subpoenas and letters in English and Spanish designating them as Material Witnesses." ROA.289. Bridge personnel "were further instructed to allow the Material Witnesses to retain their documents along with any and all receipts relating to travel expenses for which they are to be reimbursed by the Government." ROA.289. As of the date of the motion, however, no bridge staff had contacted the case agent "to inform him that the Material Witnesses ha[d] arrived [at the bridge] or made contact in preparation of their arrival." ROA.289. The motion also noted that the Government was "ready to proffer [the case agent's] testimony as to the[ ] facts [set forth in the motion] on the record." ROA.289.

Appellants opposed the motion, arguing that there had been "no subpoena enforcement or formal follow-up," "no prepaid travel or lodging coordination," "passive and ineffectual contact attempts," and "no affidavits or sworn statements from the witnesses establishing their refusal or inability to attend." ROA.329-31 (capitalization modified from original).

The district court addressed the motion during a pretrial conference on June 26, 2026. ROA.767-75. The court first confirmed with appellants' counsel that they had been able to cross-examine the material witnesses during their depositions. ROA.767-68. After counsel confirmed that fact, the court heard from the parties and compared the facts here to those in *United States* v. *Gaspar-Felipe*, 4 F.4th 330, 335 (5th Cir. 2021), in which this Court affirmed a district court's finding of unavailability. ROA.768. Finding "quite a bit of overlap and that the efforts that the government has taken here" and noting that the Government's efforts "compare[d] favorably with the efforts taken by the government in . . . *Gaspar-Felipe*," the district court ultimately held that the Government had made reasonable efforts "to maintain and contact or try to contact the material witnesses after the depositions and to secure their presence here for -- for

trial." ROA.768, 774. The court, nevertheless, "ask[ed] that the government between [the pretrial conference] and the time of trial… make at least two more attempts to contact the material witnesses and be able to represent to the court before the beginning of trial that those efforts have been made on two separate days just to ensure the government continues its efforts to try to get [the material witnesses] to appear here in person." ROA.775. At a subsequent pretrial conference, the district court found "that the government ha[d] complied with [its] order that they make two additional contacts with the material witnesses" and it "continue[d] to find that they're unavailable for purposes of trial and that the government ha[d] satisfied its obligations to try to get them to appear at trial." ROA.870.

### B. The jury finds appellants guilty on all counts after the government presents audio visual evidence, photographs, testimony about appellants' admissions, and statements by the material witnesses.

At trial, the case agent testified that the investigation of appellants began with "a tip from the HSI tipline regarding the business owners of Abby's Bakery. ROA.1221. It alleged that the business owners had employed illegal aliens and were housing them at the bakery," "that the

employees were not being paid, and that children were involved." ROA.1221. Through the course of the case, investigators were able to corroborate parts of that tip by confirming that appellants "were, in fact, employing illegal aliens and that they were housing them at the bakery." ROA.1221. Among other investigative steps, investigators conducted surveillance at about 9 pm and saw men going from the bakery toward Suite 5, and at approximately 3:30 am, when they saw the men going from Suite 5 to the bakery. ROA.1223-24, 1228.

The United States introduced an audiovisual recording of much of the worksite enforcement action at Abby's bakery, including Baez-Lara taking investigators to Suite 5, where they encountered its papered-over door and windows shown in Section I, above. ROA.3646 (GX 19 (audiovisual recording), ROA.3647-85 (GX 20 (transcript and translation of GX 19)). It also introduced photographs showing the living conditions inside Suite 5, including those in Section I, above. ROA.3466-72 (photos), ROA.1115-17 (testimony describing photos). Regarding Suite 5, on the recording, Avila-Guel states, "we rent them a room." ROA.3663 (GX 20). Describing a photograph of the entrance to Suite 5 that was introduced as Government Exhibit 11 (below), an investigator testified, "This is the

storefront of the plaza. . . . As you can see there, it's advertised as Dulce's Cafe. The door to your left down the hallway, that's suite five and it has a five on top of the door." ROA.1120.




**Entrance to Suite 5**

ROA.3473 (GX 11).

In addition to statements about housing the aliens in Suite 5, in the recording admitted as Government Exhibit 19, Avila-Guel also states that they pay the aliens $8 an hour in cash and Baez-Lara explains that they pay in cash, rather than a check because "[t]hey can't cash it." ROA.3659-60 (GX 20). Baez-Lara also explains that the aliens "eat in the

bakery" and that "what we do like owners, we give them their privilege to eat, food…we give them food." ROA.3674-75 (GX 20).

Multiple investigators also testified about appellants' admissions.[6] One investigator testified that appellants had said that they do not fill out I-9 forms for the employees they hire. ROA.1105-06. That investigator explained that an "I-9 form is a form that employers are obligated to fill out when employing -- whenever they're employing workers, whether they're here legally or not," and further testified that appellants did not keep a list of their employees. ROA.1108, 1110. Another investigator testified that Baez-Lara "indicated that he paid his employees in cash because of their lack of status in the U.S. or their inability to cash checks and the like because they didn't have any proper documentation to be here in the United States." ROA.1163-64. The investigator also testified that Baez-Lara had stated that the employees lived in Suite 5, which was physically connected to the bakery and was "all part of one building." ROA.1164. Another investigator testified that Baez-Lara had admitted that he provided the aliens with food.

[6] The record does not indicate whether investigators were testifying about the same statements recorded in GX 19 (and transcribed/translated in GX 20) or whether they were referring to portions of the interview with Avila-Guel and Baez-Lara that were not recorded in GX 19.

ROA.1204.

Investigators also testified about statements that the material witnesses had made.[7] Recounting an interview with Sanchez-Gonzalez, one of the investigators testified that Sanchez-Gonzalez said he had been smuggled "through the river through Matamoros into Brownsville." ROA.1112-13. He had been given Baez-Lara's name by a friend in Mexico who had previously worked for him, so Sanchez-Gonzalez "contacted Mr. Baez[-Lara], Mr. Baez[-Lara] offered him a job" and "also offered him housing in suite five of the plaza" where the bakery was located. ROA.1114. In the interview, Sanchez-Gonzalez said he was paid "approximately about $350 per week in cash" for his work at the bakery. ROA.1115. Sanchez-Gonzalez also said that, although they had running water, "that they did not have heated water and they had no kitchen" in Suite 5. ROA.1115. Another investigator testified that Ibarra-Otero had told the investigator that he was living in suite 5 and "was paid in cash, approximately 450 a week." ROA.1168.

Additionally, pursuant to the district court's ruling that the material witnesses were unavailable for trial, the United States

[7] Appellants did not lodge a hearsay objection to this testimony.

introduced the audiovisual recordings of their depositions, including both their direct examination and their cross-examination by appellants' counsel.[8] ROA.1265, 3477-3645. In his deposition, Sanchez Gonzalez stated that, after arriving illegally in the US, he was taken "[t]o the address where [he] was going to work" which turned out to be Abby's Bakery. ROA.3570-71. He met with Baez-Lara who said he would hire him seasonally and told him he could stay there. ROA.3571-72. It was Sanchez-Lara's impression that appellants gave him permission to stay in Suite 5 while he worked for the bakery. ROA.3584. He was paid in cash ROA.3579 and was allowed to eat appellants' food in the bakery ROA.3579-80 ("We were able to eat breakfast or brunch and lunch and dinner."). Sanchez-Gonzalez sent the money he earned to his family. ROA.3581.

Ibarra-Otero testified to similar facts in his deposition. He testified that Baez-Lara picked him up after he was smuggled into the US. ROA.3490. While working at appellants' bakery, he received orders from

[8] Before admission of the depositions, appellants' counsel addressed the district court stating, "Just re-urge our pretrial objection for the record, Your Honor." ROA.1266, 1267 (joining objection). The district court responded, " Okay. So that's preserved. . . . All right. So you may go ahead and proceed with the deposition testimony." ROA.1266.

Baez-Lara and occasionally Avila-Guel. ROA.3496-97. He was paid in cash, ate at the bakery for breakfast and lunch, and did not have to pay appellants for either the food he ate or rent for Suite 5. ROA.3496, 3506. His impression was that appellants allowed him to stay in Suite 5, which was a 30-meter walk from where he worked at the bakery, while he was working there. ROA.3499-3502. He sent the money earned home to his family. ROA.3496.

At the close of the Government's case, appellants moved for a judgment of acquittal pursuant to Fed. R. Crim. P. 29, arguing that there was insufficient evidence to support a conviction on any count. ROA.1276-80. The district court immediately denied the motion as to Counts Two and Three and denied it as to Count One after hearing further argument the following day. ROA.1279, 1313.

Regarding the elements of the conspiracy charged in Count One, the district court instructed the jury:

> For you to find the defendant guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:
>
> First: That the defendant and at least one other person made an agreement to commit the crime of harboring aliens who had entered or remained in the United States in violation of law; and

> Second: That the defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose.

ROA.1325-26. Regarding the elements of the substantive harboring charges in Counts Two and Three, the district court instructed the jury, pursuant to Pattern Jury Instruction 2.01C:

> These are the offenses under 8 U.S.C. 1324(a)(1)(A)(iii) and 1324(a)(1)(A)(v)(II). . . . For you to find the defendants guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:
>
> First: That the alien entered, came to, or remained in the United States in violation of law;
>
> Second: That the defendant harbored or attempted to harbor the alien within the United States;
>
> Third: That the defendant knew or acted in reckless disregard of the fact that the alien entered, came to, or remained in the United States in violation of law; and
>
> Fourth: That the defendant's conduct tended to substantially facilitate the alien entering, coming to, or remaining in the United States illegally.

ROA.1327-28. It further instructed the jury that, "the mere act of providing shelter to an alien is not, alone, sufficient to prove beyond a reasonable doubt that the defendant harbored an alien." ROA.1328.

The parties delivered their closing arguments after the district court instructed the jury. ROA.1336-64. Appellants' counsel devoted

substantial time to arguing that there was no evidence that appellants sought to hide or conceal the material witnesses. Among such arguments, Avila-Guel's counsel told the jury, "please remember the fact that there was no concealment, no covertness . . . no shielding from detection." ROA.1350. Baez-Lara's counsel similarly argued, "There's no locked gates, no hidden rooms, no concealment, no one is hiding. This is really life in the open[,]" ROA.1352. He further argued, "The question is whether Nora [Avila-Guel] or Leonardo [Baez-Lara] harbored, and harbored is not defined. And Congress left it up to you, the people, to decide what that definition is using your common sense." ROA.1354. Counsel continued, "lets look at the evidence. Again, customers came, there was [sic] no lookouts, no false names, no evasive behavior. They didn't even have a key. I think that's kind of the opposite of hiding." ROA.1354.

Specifically addressing Counts Two and Three, Baez-Lara's counsel urged the jury to "[a]sk the hard question the law demands: What act was designed to keep either man out of law enforcement's view?" ROA.1355. Counsel also asked rhetorically, "Where's the transportation used to avoid detection" and then answered, "We didn't hear any of that.

We heard ordinary life, walking to work, walking to Walmart, going to buy hamburgers at Stars, resting after work. Ordinary visibility is not harboring." ROA.1355-56. He further asserted that "[t]he law punishes hiding, not helping" and that "[t]he government chose a statute that requires harboring and substantial facilitation." ROA.1356. He proceeded, "We saw a public bakery, a visible room, open cooperation, no disguises, no evasive plan, no lies, no smuggling arranged by Nora or Leonardo, just work with friends and family, food, a place to sleep. The charge doesn't fit the proof." ROA.1356. Continuing that theme, counsel told the jury, "I think we can all use our common sense and say ordinary employment, plus a free room, does not amount to harboring. There was no hiding, and they worked in the open." ROA.1358.

In the Government's rebuttal argument, the prosecutor responded to appellants' arguments, "[defense counsel] said harboring is not defined. Partially correct, right?" ROA. 1362. He continued, "Harboring does have the four prongs [set forth in the jury instructions] and harboring is kind of defined in the negative, in the sense it's not just mere shelter." ROA.1362. He further explained, "So, essentially, it has to be shelter plus something else. What is the something else here?

Employment. That's what makes it harboring." ROA.1362. The prosecutor also responded to appellants' "no hiding" argument, stating, "both counsel state, well, they weren't hidden or concealed. Look at your jury charge. That is not a requirement we have to prove. They don't have to be hidden or concealed." ROA.1362.

The jury convicted appellants on all counts. ROA.566, 2649. They were both sentenced to 4 months' imprisonment on each count to be served concurrently. ROA.568, 2651.

## SUMMARY OF ARGUMENT

Although phrased as a challenge to the sufficiency of the evidence, appellants primarily take issue with the district court's interpretation of the elements of the harboring statute, an argument that would be more properly addressed in the context of a challenge to the district court's jury instructions. Appellants' core argument, that proving "harboring" in the context of 8 U.S.C. § 1324 requires proof of concealment or shielding from detection, is contrary both to the plain language of the statute and this Court's precedent holding that the statute sets forth distinct ways it can be violated, not overlapping terms that share the same meaning of concealment. In any event, even if appellants' interpretation of

"harboring" were correct, there was ample evidence—particularly when viewed in the light most favorable to the prosecution—from which the jury could have reasonably concluded that appellants intended, at least in part to conceal and shield the material witnesses from detection based on the manner in which they housed them (in a non-residential commercial space with papered-over windows) and the actions they took in employing them (such as failing to complete I-9 forms, and paying in cash).

Appellants also fail to show any reversible Confrontation Clause error. The attempts the Government made to secure the appearance of the material witnesses mirrored the type of efforts that this Court has held are sufficient to establish that a witness is unavailable. These efforts were sufficient to allow admission of the witnesses' prior recorded testimony. Appellants have not met their burden to show plain error with respect to their newly raised argument that they were denied an adequate opportunity to cross-examine the material witnesses because, at the time of their depositions, they did not know that the Government would focus its proof on the "harboring" element of § 1324, rather than seeking to prove the "conceal" or "shield from detection" elements.

Alternatively, given the overwhelming evidence of appellants' guilt in the form of their own statements, photographs and videos, and testimony from investigators (including unobjected-to testimony about statements by the material witnesses), any Confrontation Clause error was harmless.

## ARGUMENT

### I. Sufficient evidence supported appellants' convictions for harboring and conspiring to harbor.

#### A. Standard of review—de novo, but highly deferential to the verdict

Even preserved sufficiency-of-the-evidence challenges are reviewed under a standard that places "a heavy thumb on the scale in favor of the verdict." *United States* v. *Cabello*, 33 F.4th 281, 288 (5th Cir. 2022). Such claims are reviewed de novo, but with "substantial deference" to the verdict. *United States* v. *Jimenez*, 158 F.4th 628, 632 (5th Cir. 2025). Under this standard, this Court "must affirm a conviction if, after viewing the evidence and all reasonable inferences in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States* v. *Vargas-Ocampo*, 747 F.3d 299, 300-01 (5th Cir. 2014) (en banc).

On appeal, "the question is not whether this [C]ourt believes that the evidence at the trial established guilt beyond a reasonable doubt[,]" but "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States* v. *del Carpio Frescas*, 932 F.3d 324, 328 (5th Cir. 2019) (emphasis added and internal quotation omitted). The jury retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses." *United States* v. *Grant*, 683 F.3d 639, 642 (5th Cir. 2012). Thus, on appeal, this Court "asks only whether the jury's decision was rational, not whether it was correct." *United States* v. *Fulton*, 928 F.3d 429, 438 (5th Cir. 2019) (quotations omitted). This standard sets "a high bar" for an appellant to overcome. *United States* v. *Yusuf*, 57 F.4th 440, 444 (5th Cir. 2023).

### B. A jury could reasonably conclude that appellants harbored the material witnesses and conspired to harbor illegal aliens.

To prove that a defendant violated 8 U.S.C. § 1324(a)(1)(A)(iii), the Government must prove that "(1) the alien entered or remained in the United States in violation of the law, (2) the defendant concealed,

harbored *or* sheltered the alien in the United States, (3) the defendant knew or recklessly disregarded that the alien entered or remained in the United States in violation of the law, and (4) the defendant's conduct tended to substantially facilitate the alien remaining in the United States illegally." *United States* v. *De Jesus-Batres*, 410 F.3d 154, 160 (5th Cir. 2005) (emphasis added). This Court has recognized that the terms "conceal, harbor, or shield form detection" in 8 U.S.C. § 1324 are not synonymous and represent distinct ways in which defendant may violate the statute. *United States* v. *Rubio-Gonzalez,* 674 F.2d 1067, 1073 (5th Cir. 1982). Indeed, this Court has explicitly held that "Section 1324(a)(3) by its express terms may be violated in any one of several ways-by harboring, or by concealing, or by shielding from detection or by attempting to do any of these" and that "[t]o sustain a conviction it is not necessary that the accused be shown to have violated the act in all of the ways in which it could be violated." *Id.*; *see also United Sates* v. *Cantu*, 557 F.2d 1173, 1180 (5th Cir. 1977) (where defendant was specifically charged with shielding an alien from detection, district court properly declined to give jury instruction defining "shield" as "hide" because doing so would render the statutory term "conceal" redundant).

Appellants only challenge the sufficiency of the evidence as to the second element. They argue that, to prove harboring, the Government "was required to prove conduct involving concealment, shielding from detection, or comparable covert conduct." Appellants' Br. at 38.[9] That argument, however, cannot be squared with this Court's binding decisions in *Rubio-Gonzalez* and *Cantu*, which recognized that the alternatives in § 1324 are distinct ways to violate the statute. *Cantu*, 557 F.2d at 1180.[10]

Further, this Court has recognized that "'harbor' is perhaps a somewhat broader concept than 'conceal' or 'shield from detection.'" *Rubio-Gonzalez*, 674 F.2d at 1073 n.5. It has further explained that, by

---

[9] Page citations to appellants' brief refer to the pagination in the ECF header.

[10] Considering the on-point authority of *Rubio-Gonzalez* and *Cantu*, appellants' reliance on civil cases that did not specifically address the elements of § 1324 in the context of a criminal prosecution is misplaced. *See* Appellants' Br. at 21 (citing *Cruz* v. *Abbott*, 849 F.3d 594 (5th Cir. 2017) and *Villas as Parkside Partners* v. *City of Farmer's Branch*, 726 F.3d 524 (5th Cir. 2013)). Appellants' reliance on *United States* v. *Varyonki*, 645 F.2d 453 (5th Cir. 1981) is likewise misplaced. Appellants quote *Varyonki* for the proposition that "harboring requires conduct that goes 'beyond mere employment.'" Appellants' Br. at 21-22. The quoted "mere employment" language in *Varyonki*, is from a prior version of 8 U.S.C. § 1324 and is not present in the current version of the statute under which appellants were convicted. *Compare Varyonki*, 645 F.2d at 459 n.6 (quoting then-extant provision of 8 U.S.C. § 1324(a) as stating that "for the purposes of this section, employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring") *with* current 8 U.S.C. § 1324(a) (with no exception for employment).

enacting § 1324, Congress "intended to broadly proscribe any knowing or willful conduct fairly within any of the[ ] terms [harbor, conceal, and shield from detection] that tends to substantially facilitate an alien's remaining in the United States illegally." *Id.* Here, the district court's conclusion that harboring can be shown by proof of providing shelter plus other elements such as "employment, " "concealment or shielding," or "other things," (ROA.785), is consistent with *Rubio-Gonzalez* and *Cantu* and appellants fail to show any reversible error. Assessed against this standard, the trial evidence showing that appellants provided the aliens with free shelter concealed within a commercial space seconds from the bakery where appellants employed and paid them in cash, fed them, and failed to document their employment on required immigration-related forms, was sufficient to prove the harboring element of § 1324.

**C. Even if harboring required the government to show "concealment, shielding from detection, or comparable covert conduct," the jury could reasonably conclude that appellants' actions met that standard.**

The rent-free living quarters that appellants provided the material witnesses was a commercial "suite," located in the same strip mall as appellants' bakery, approximately 30 meters away. *See* ROA.3496, 3499, 3502, 3584. The glass door of that suite, tucked into an alcove near a sign

for a café, was completely covered in nondescript brown paper, as shown in the images below. ROA.3473, 3646 (GX 11, GX 19 10:29). The windows were likewise covered in plain paper or cardboard, as shown in the photograph admitted as Government Exhibit 9.[11] ROA.3471 (GX 9).







[11] Regarding the window coverings, material witness Roberto Ibarra Otero testified that "[w]e placed paper just paper here like gift paper . . . . for example, during Christmas we put paper with pine trees. . . [j]ust as decoration." ROA.3514. He also testified that appellants did not put the paper over the windows. ROA.3514. As with all testimony, the jury was free to decide not to credit it, particularly considering the photographic evidence showing that the windows were covered in utilitarian brown paper, not decorative Christmas wrapping.




It is reasonable to infer that Suite 5's door and windows were papered over with nondescript brown paper, at least in part, to create the outward appearance that the suite was simply an unused commercial property and to conceal the fact that the material witnesses (and other bakery employees) were living there. Appellants' choice to house the witnesses in this commercial space, tucked behind a restaurant, and lacking hot water or a functional kitchen, reasonably supports the inference that appellants did so—at least in part—to avoid the witnesses interacting with landlords, leasing agents, or others associated with a

conventional residence, in an effort to avoid interactions with people (and the creation of records such as leases or rental agreements) that might lead to their discovery.

The inference that appellants sought to shield the material witnesses from detection through their living arrangement is further supported by the proximity of the concealed living quarters to appellants' bakery. The 30-meter distance between the living quarters and the bakery could be covered in a 30-to-40-second walk, minimizing the time the material witnesses were visible to the public "on the street" each day during their brief commutes to work. ROA.3646 (GX 19 at 8:57-9:34, 21:29-22:06). The evidence that appellants regularly provided the material witnesses with meals at the bakery further supports a reasonable inference that appellants sought, at least in part, to conceal the witnesses from detection by limiting the amount of time they were outside the bakery or their concealed living quarters. *See* ROA.3674-75, 3580.

Beyond the nature and circumstances of the concealed living quarters and the food that appellants provided, additional evidence supported the inference that they concealed the material witnesses from

discovery. Appellants did not complete I-9 forms that are required for all employees and did not keep an employee list, thus avoiding creating records that might have led to the discovery of the witnesses' employment and illegal presence in the United States. ROA.1105-06. They paid the material witnesses in cash, "because of their lack of status in the U.S. or their inability to cash checks and the like because they didn't have any proper documentation to be here in the United States." ROA.1115, 1163-64, 1168, 3496, 3579, 3663 (GX 20). It is reasonable to infer that those cash payments further concealed (and were intended to conceal) the witnesses' illegal presence by limiting the need for them to interact with government officials who issue identification documents, bank employees, and others who might have discovered the witnesses' status as illegal aliens if they had been paid through conventional arrangements such as a paycheck or direct deposit.

Thus, even if appellants could show that to prove harboring under 8 U.S.C. § 1324, the Government must show that defendants intended to conceal or shield the aliens from detection, viewing "all reasonable inferences in the light most favorable to the prosecution," the totality of the evidence regarding where and how they housed, paid, and

documented (or, rather, failed to document) the aliens' employment, there was ample evidence from which a rational juror could conclude that appellants acted with the intent to shield or conceal.[12] *Vargas-Ocampo*, 747 F.3d at 300-01.

## II. Presentation of the material witnesses' recorded deposition testimony was consistent with the Confrontation Clause.

### A. Standard of review—de novo and plain error

Confrontation Clause objections that were properly raised at trial are reviewed de novo, subject to harmless error analysis. *United States* v. *Acosta*, 475 F.3d 677, 680 (5th Cir. 2007). As with other unpreserved errors, however, Confrontation Clause issues that were not contemporaneously raised at trial are reviewed only for plain error. *Id.* Generally, to preserve an error for appellate review and avoid the onerous plain-error standard, "an objection must be sufficiently specific to alert the district court to the nature of the alleged error and to provide an opportunity for correction." *United States* v. *Neal*, 578 F.3d 270, 272

[12] For the same reason, appellants' argument that the trial evidence only showed "open employment and housing" fails. *See, e.g.,* Appellants' Br. at 39. Particularly when viewed in the light most favorable to the prosecution, neither the aliens' housing behind papered-over windows in a commercial space in a strip center that gives no outward appearance of a residence, nor their off-the-books work for cash without customary records like I-9 forms can be fairly characterized as "open."

(5th Cir. 2009).

To prevail under the plain error standard, appellants bear the burden to show that (1) there was an error or defect; (2) the error was clear or obvious, rather than subject to reasonable dispute; and (3) the error affected their substantial rights, which ordinarily means that they must demonstrate that the error affected the outcome of the proceedings. *See Puckett* v. *United States*, 556 U.S. 129, 135 (5th Cir. 2009); *United States* v. *Dominguez Benitez*, 542 U.S. 74, 82 (5th Cir. 2004). Appellants also bear the burden to show that this Court should exercise its discretion under the "fourth prong" of plain error review, pursuant to which this Court will correct an error only where it seriously and adversely affects the fairness, integrity, or public reputation of judicial proceedings. *See Puckett*, 556 U.S. at 135; *United States* v. *Chavez-Hernandez*, 671 F.3d 494, 497-98 (5th Cir. 2012).

In the district court, appellants raised a single objection to the admission of the material witnesses' recorded deposition testimony, arguing that the government had not met its burden to show that the witnesses were "unavailable." ROA.329-32, 1266-67. Because they properly preserved that issue, it is reviewed de novo. *See Acosta*, 475 F.3d

at 684 (reviewing de novo the only issue as to which appellant raised a Confrontation Clause objection).

Appellants also, however, raise a new Confrontation Clause issue on appeal, arguing that despite cross-examining the material witnesses during their depositions, they "never received the meaningful opportunity for cross-examination the *Crawford* requires." Appellants' Br. at 44. Because they did not object on that basis below, their argument is reviewed only for plain error. *Acosta*, 475 F.3d at 680-81 (reviewing Confrontation Clause issues not raised at trial for plain error).

**B. The material witnesses were unavailable despite the Government's reasonable efforts to secure their appearance at trial.**

Admission of a witness's previously recorded deposition testimony satisfies the Confrontation Clause where the Government can demonstrate their unavailability for trial. *United States* v. *Allie*, 978 F.2d 1401, 1406 (5th Cir.1992). In reviewing whether the Government has made the requisite showing, this Court assesses whether the "aggregate efforts of the Government to obtain the presence of the . . . witnesses at . . . trial were reasonably sufficient." *United States* v. *Pineda-Rodriguez*, No. 20-51031, 2021 WL 5871880, at *1 (5th Cir. 2021) (citing *United*

*States* v. *Gaspar-Felipe*, 4 F.4th 330, 338-39 (5th Cir. 2021)).

In cases involving witnesses who have been deported or removed, among other factors, this Court looks to whether "[t]he record establishes that, before the witnesses were removed, the Government undertook actions that were indicative of a bona fide effort to have the witnesses appear at trial" and whether, "after the witnesses were removed, the Government made legitimate and credible attempts to obtain their presence at trial." *Id.* (citing *Gaspar-Felipe*, 4 F.4th at 338-39).

This Court has "previously found reasonable the following measures taken by the Government to secure the presence of a deported witness: (1) giving the witness the option of remaining in the United States with work permits; (2) providing witness fees and travel cost reimbursements; (3) giving the witness a subpoena and letter to facilitate his or her reentry into the United States; (4) calling the witness in his or her home country; (5) getting repeated assurance from the witness that he or she would return; (6) apprising border inspectors of the witness's expected arrival into the United States; and (7) issuing checks to be given to the witness upon his or her reentry into the United States." *United States* v. *Calderon-Lopez*, 268 F. App'x 279, 289 (5th Cir. 2008) (citing

*Allie*, 978 F.2d at 1407). It has "further recognized that the Government need not take all of these steps to establish that it acted reasonably to secure a witness's presence." *Id.* (citing *United States* v. *Aguilar-Tamayo*, 300 F.3d 562, 566 (5th Cir. 2002)).

Here, measured against these standards, the record reflects that, in the aggregate, the Government took reasonable steps to secure the material witnesses' appearance at trial and that it made bona fide efforts toward that end beginning as early as their depositions. During those depositions, the Government obtained telephone numbers to contact the material witnesses. ROA.3484, 3564-65. It served the witnesses with trial subpoenas. ROA.108-11, 3553, 3640-42. It provided the witnesses with contact information for the case agent, assigned AUSA, and a victim witness coordinator. ROA.3553, 3640-42. The Government also gave the witnesses a letter in Spanish and English, explaining that they would be reimbursed for travel, directing them to arrive at the Gateway International Bridge, and identifying a particular individual at the U.S Attorney's Office as the person who would be in charge of travel arrangements. ROA.3554,[13] 3640-42.

[13] The letter provided to the material witnesses with their subpoenas was described

Call logs submitted to the district court reflected that, within a month after they were released and returned to Mexico, the case agent began trying to contact the witnesses via the phone numbers they had provided. ROA.288, 299-300. Those efforts continued, weekly, over the course of more than two months and were supplemented by additional efforts to contact the witnesses as the trial date approached. ROA.299-300, 870. Additionally, the case agent sought assistance in locating the witnesses in Matamoros, Mexico, by contacting the State Department contact there and requesting a search of an official Mexican government database along with other informal searches. ROA.289. The agent also contacted the international bridge to inform them that the Material Witnesses should be paroled into the United States on the basis of their subpoenas and letters designating them as Material Witnesses. ROA.289. The agent also gave bridge personnel further instructions to facilitate the material witnesses' travel, such as directing the bridge personnel to allow the Material Witnesses to retain their documents and all receipts relating to travel expenses for which they were to be

in more detail at Ibarra-Otero's deposition than it was at Sanchez-Martinez's deposition. *Compare* ROA.3554 *with* ROA.3641-42. Nothing in the record, however, indicates that the letters given to the witnesses were substantively different.

reimbursed by the Government. ROA.289.

The steps taken by the Government here parallel efforts that this Court has found sufficient to establish a witness's unavailability. In the aggregate they reflect a genuine good faith effort by the Government to secure the witnesses' appearance at trial.

### C. Appellants cannot show reversible plain error regarding their newly raised claim that they were denied an effective opportunity to cross-examine the material witnesses.

Appellants raise a new Confrontation Clause argument on appeal, asserting that their rights were violated because, at the time they cross-examined the material witnesses during their depositions, they did not yet know that the United States intended to focus on the element of harboring, rather than the elements of concealing or shielding from detection. Appellants' Br. at 44. As noted above, because appellants did not raise this argument below, to prevail on appeal they must surmount all prongs of plain error review. They cannot do so.

As an initial matter, appellants fail to show any error and thus cannot meet their burden under the first prong of plain-error review. The gravamen of their argument is that the Confrontation Clause requires that they be apprised of the Government's trial strategy and the

particulars of how it intends to prove its case before cross-examining any witness. That argument misconstrues the nature of the right protected by the Confrontation Clause. The clause protects a defendant's right to challenge the reliability of a witness's testimony. *See Melendez-Diaz* v. *Massachusetts*, 557 U.S. 305, 317–18 (2009) (the Confrontation Clause's procedural guarantee commands "that *reliability* [of testimony] be assessed in a particular manner: by testing in the crucible of cross-examination.") (emphasis added) (internal quotation omitted). It does not, as appellants suggest, establish a broad requirement that appellants be advised, prior to questioning a witness, about the Government's trial strategy. Here, appellants had ample opportunity to challenge the reliability of the material witness's testimony during their depositions. Accordingly, they cannot show that their Confrontation Clause rights were violated.

Moreover, even if appellants could meet their burden under the first prong of plain-error review, their argument would fail under the second prong. This Court has observed that a "lack of binding authority is often dispositive in the plain-error context." *United States* v. *Gonzalez*, 792 F.3d 534, 538 (5th Cir. 2015). That is true because, when assessing the

second prong, this Court will only reverse if it "determine[s] that the error was 'obvious under existing law.'" *United States* v. *Foley*, 946 F.3d 681, 688 (5th Cir. 2020) (quoting *United States* v. *Miller*, 634 F.3d 841, 843 (5th Cir. 2011). To meet that standard, a defendant must show that his appellate argument is based on "straightforward applications of case law." *United States* v. *Vargas-Soto*, 700 F.3d 180, 182 (5th Cir. 2012). Appellants cannot do so.

Appellants cite no on-point authority that can be straightforwardly applied to show the error that assert on appeal. Rather, they cite a single, unpublished case, *United States* v. *Calderon-Lopez*, 268 F. App'x 279 (5th Cir. 2008). *See* Appellants' Br. at 44. *Calderon-Lopez*, however, offers no basis for finding error, let alone clear or obvious error. In *Calderon-Lopez*, this Court rejected a claimed Confrontation Clause error related to the return of a superseding indictment containing a new charge against a defendant. Here, in contrast, there was no superseding indictment or new charge the indictment charged § 1324(a)(1)(A)(iii) in the conjunctive. ROA.42-43. As such, appellants were fully aware that the government could proceed on a theory that they harbored the aliens. Particularly in light of that difference, whatever precedential weight the unpublished

opinion in *Calderon-Lopez* might carry, it does not "straightforward[ly]" show that the Confrontation Clause was violated here when the United States opted to proceed under the harboring element of § 1324 rather than the concealing or shielding from detection elements in the existing charges against appellants.

## III. Alternatively, any Confrontation Clause error was harmless.

When determining whether a purported error is harmless beyond a reasonable doubt, this Court looks at "the totality of circumstances including all of the evidence adduced." *United States* v. *Watkins*, 741 F.2d 692, 695 (5th Cir. 1984). The "facts of the case and the evidence adduced at trial" are reviewed "to determine the effect of the unlawfully admitted evidence 'upon the other evidence adduced at trial and upon the conduct of the defense.'" *Id.* (quoting *Fahy* v. *Connecticut*, 375 U.S. 85, 87 (1963)). This Court "must then decide whether, absent the so-determined unconstitutional effect, the evidence remains not only sufficient to support the verdict but so overwhelming as to establish the guilt of the accused beyond a reasonable doubt." *Id.*

Here, any error admitting the deposition testimony of the material witnesses was harmless. The most probative trial evidence against

appellants was their own admissions that they employed, housed, and fed the material witnesses and other illegal aliens, that they paid them in cash precisely because, as illegal aliens, they were unable to cash checks, and that they did not complete I-9 forms that would have created a record of the aliens' employment. The photographic and audiovisual evidence regarding Suite 5 provided similarly strong evidence supporting the jury's verdict. Finally, the statements by the material witnesses that were admitted through the testimony of investigators—without objection by appellants—when combined with the other evidence was sufficiently "overwhelming as to establish the guilt of the [appellants] beyond a reasonable doubt" without regard to the admission of their deposition testimony. *Watkins*, 741 F.2d at 695. Indeed, particularly when assessed against the investigators' testimony about what the material witnesses stated in interviews, much of the witnesses' deposition testimony is cumulative. While the deposition testimony corroborates the other evidence presented at trial, the record reflects that the other evidence was sufficiently compelling to conclude that any Confrontation Clause error in admitting the depositions was harmless.

## CONCLUSION

For the foregoing reasons the United States respectfully requests that this Court affirm the judgment of the district court.

Respectfully submitted,

AARON F. REITZ
United States Attorney

CARMEN CASTILLO MITCHELL
Chief, Appellate Division

s/ Jason Smith
Jason B. Smith
Assistant United States Attorney
United States Attorney's Office
Southern District of Texas
1000 Louisiana, Ste. 2300
Houston, Texas 77002
(713) 567-9102

ATTORNEYS FOR APPELLEE

**CERTIFICATE OF SERVICE**

I, Jason Smith, Assistant United States Attorney, hereby certify that on [September 23, 2026], *Plaintiff–Appellee's Brief* was electronically filed and served on counsel of record via this Court's ECF system. Upon notification that the electronically filed brief has been accepted as sufficient, and upon the Clerk's request, seven paper copies of this brief will be submitted to the Clerk. *See* 5th Cir. R. 25.2.1; 5th Cir. R. 31.1; 5th Cir. ECF filing standard E(1).

*/s/ Jason Smith*
Jason Smith
Assistant United States Attorney

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains [8765] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in Century Schoolbook, 14-point font for text and 12-point font for footnotes.

3. This brief complies with the privacy-redaction requirement of 5th Cir. R. 25.2.13 because it has been redacted of any personal data identifiers.

4. This brief complies with the electronic-submission requirement of 5th Cir. R. 25.2.1 because it is an exact copy of the paper document.

5. This brief has been scanned for viruses with the most recent version of McAfee Endpoint Security and is free of viruses.

*/s/ Jason Smith*
Jason Smith
Assistant United States Attorney
Dated: [September 23, 2026]